**Rufus LEE, Jr., Plaintiff,**

v.

**Lawrence KOLB, Commissioner of Mental Hygiene for the State of New York, and Desmond Moleski, Director of the Buffalo Psychiatric Center, Buffalo, New York, Defendants.**

No. Civ. 75–37.

United States District Court,
W. D. New York.

May 1, 1978.

4. *See* this court's recent holding in *Navarro v. Sedco, Inc.*, 449 F.Supp. 1355 (S.D.Tex.1978).

Paul Ivan Birzon, Nelson F. Zakia, Runfola, Birzon & Renda, Buffalo, N. Y., for plaintiff.

Louis J. Lefkowitz, Atty. Gen., of the State of N. Y., New York City, for defendants; Eugene A. Panfil, Buffalo, N. Y., of counsel.

Before VAN GRAAFEILAND, Circuit Judge, and CURTIN and ELFVIN, District Judges.

### MEMORANDUM and ORDER

ELFVIN, District Judge.

Plaintiff challenges the constitutionality of the mandatory commitment and release provisions of section 330.20 of the Criminal Procedure Law of the State of New York ("C.P.L. § 330.20") which in pertinent part provides:

"1. Upon rendition of a verdict of acquittal by reason of mental disease or defect, the court must order the defendant to be committed to the custody of the commissioner of mental hygiene to be placed in an appropriate institution in the state department of mental hygiene. * * *.

"2. If the commissioner of mental hygiene is of the opinion that a person committed to his custody, pursuant to subdivision one of this section, may be discharged or released on condition without danger to himself or to others, he must make application for the discharge or release of such person in a report to the court by which such person was committed * * *.

"3. If the court is satisfied that the committed person may be discharged or released on condition without danger to himself or others, the court must order his discharge, or his release on such conditions as the court determines to be necessary. If the court is not so satisfied, it must promptly order a hearing to determine whether such person may safely be discharged or released. Any such hearing shall be deemed a civil proceeding. After such a hearing, the committed person must be discharged, released on such conditions as the court determines to be necessary, or recommitted to the commissioner of mental hygiene. * * *.

\* \* \* \* \* \*

"5. A committed person may make application for his discharge or release to the court by which he was committed, and if, after receiving a report of the commissioner of mental hygiene, the court considers there may be merit in the application, the court must follow the procedure prescribed in subdivisions two and three of this section.

"6. A defendant committed to the custody of the commissioner of mental hygiene pursuant to the provisions of this section may at any time during the period of his commitment be transferred to an appropriate institution in the state department of mental hygiene."

Plaintiff alleges that C.P.L. § 330.20 violates his rights to due process and equal protection of the laws and constitutes cruel and unusual punishment in violation of the

Eighth and Fourteenth Amendments to the United States Constitution. He invokes the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1343(3) and seeks declaratory and injunctive relief as well as compensatory and punitive damages. This action having been commenced prior to August 12, 1976, a three-judge court was convened pursuant to former sections 2281 and 2284 of Title 28 of the United States Code.

Plaintiff was convicted December 17, 1965 by a jury of the crime of murder and was sentenced to a term of life imprisonment. In October 1968, the Judgment of Conviction was reversed by the Appellate Division of the New York State Supreme Court for the Fourth Judicial Department and a new trial was ordered. After plaintiff's non-jury retrial in April 1972, he was found not guilty by reason of mental disease or defect and in May 1972 was committed pursuant to the automatic commitment provisions of C.P.L. § 330.20(1) to the custody of the Commissioner of Mental Hygiene ("the Commissioner"). Uncontroverted medical testimony adduced at the retrial established that at the time of the commission of the crime charged in the indictment plaintiff suffered from acute schizophrenia, paranoid type. No inquiry and consequently no finding was made with regard to plaintiff's mental condition at the times of the retrial or of his commitment. Since the time of plaintiff's mandatory commitment, he has been confined at two state mental institutions under the jurisdiction and control of the Commissioner.

■ In November 1972, the Acting Director of the Buffalo State Hospital (now the Buffalo Psychiatric Center) where plaintiff was then confined petitioned the appropriate state court to transfer plaintiff to the Matteawan State Hospital because medical staff personnel were of the opinion that plaintiff's behavior indicated that he was dangerous to other patients and members of the hospital staff and to persons in the community. For reasons not set forth in the record, such petition either was not granted or was discontinued and plaintiff remained institutionalized at the Buffalo

State Hospital. Based upon plaintiff's subsequent improvement and response to continued treatment, the medical staff re-assessed their previous determination as to plaintiff's mental condition and recommended that he be released on condition because he did not at that time present a danger to himself or to others. Thereafter on July 17, 1973, the Commissioner pursuant to C.P.L. § 330.20(2) petitioned the committing court for the release of plaintiff from the Buffalo State Hospital and for his return to the community. After it was decided that the district attorney could fully participate on behalf of the State of New York at the hearing which was to be held on the release petition (*see, In Re Lee,* 46 A.D.2d 999, 362 N.Y.S.2d 635 (4th Dept. 1974)), no further proceedings were held with respect to such release petition. During oral argument of the instant case, defendant's counsel informed the Court of the apparent pendency of such state court proceeding. We, having voiced concern with respect to procedural and substantive ramifications which might result if the release petition filed in state court remained viable, consequently sought a clarification from counsel. Correspondence from plaintiff's counsel submitted to the Court subsequent to oral argument stated that after the district attorney was granted the right to participate fully in plaintiff's release hearing the Commissioner did not pursue further the petition he had previously filed for plaintiff's release, but to the contrary granted a request filed by the Director of the Buffalo State Hospital in August 1976 to transfer plaintiff to Mid-Hudson Psychiatric Center (the only maximum security facility within the jurisdiction of the New York Department of Mental Hygiene). Pursuant to 14 N.Y.C.R.R. 57.2, transfer of an involuntary patient to Mid-Hudson Psychiatric Center is only authorized upon a showing of "substantial risk that such patient may cause physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm", that "reasonable efforts at treatment have been made without eliminating

such substantial risk of physical harm to others" and that "the patient needs the close supervision provided at the Mid-Hudson Psychiatric Center". Following a psychiatric examination and report, the Commissioner in September 1976 ordered plaintiff transferred to Mid-Hudson Psychiatric Center where he is presently confined. Plaintiff argues that, although the Commissioner has not formally withdrawn such petition for plaintiff's release, such should be deemed abandoned, discontinued and terminated because of the apparent inconsistent and diametrically opposite action of transferring plaintiff to Mid-Hudson Psychiatric Center under the standards enumerated above. Plaintiff points out that a petition for release filed pursuant to C.P.L. § 330.20 is solely within the control of the Commissioner and that plaintiff cannot initiate and has no control over the prosecution of such proceedings. Defendants do not dispute the recitation of facts or the legal arguments set forth in plaintiff's correspondence to the Court dated September 27 and October 20, 1977 and agree with plaintiff that, although the Commissioner has never formally moved to discontinue the release petition, the Commissioner's transfer of plaintiff to Mid-Hudson Psychiatric Center at the request of the Director of the Buffalo State Hospital has the practical and legal effect of terminating any proceedings seeking release. We hold that the petition previously filed by the Commissioner for plaintiff's release has been abandoned and discontinued and that no state proceedings concerning the same are presently pending. Consequently, plaintiff may maintain the instant action. In addition, it has been previously determined by order dated July 6, 1976 that plaintiff was not required to exhaust his state remedies prior to challenging the constitutionality of C.P.L. § 330.20. Furthermore, the judicially-created doctrine of abstention first fashioned in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) has no place in this lawsuit. The New York courts have previously construed the provisions of C.P.L. § 330.20 and its predecessor section (*People v. Lally,* 19 N.Y.2d 27, 277

N.Y.S.2d 654, 224 N.E.2d 87 (1966); *People ex rel. Peabody v. Chanler,* 133 App.Div. 159, 117 N.Y.S.2d 322, *aff'd* 196 N.Y. 525, 89 N.E. 1103 (1909); *People v. McNelly,* 83 Misc.2d 262, 371 N.Y.S.2d 538 (Sup.Ct.N.Y. Coun.1975)) and there are no pending state proceedings upon which abstention could be premised as a matter of comity. *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 509, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). We therefore proceed to the merits of the case.

Plaintiff alleges in his complaint that his rights to due process and equal protection of the laws have been and are being violated in that (1) he was involuntarily committed pursuant to C.P.L. § 330.20(1) following his acquittal by reason of mental disease or defect without a pre-commitment or post-commitment hearing to determine whether he was mentally ill and dangerous at the time of trial or commitment, (2) the Commissioner after making his determination to discharge or release plaintiff on condition was required by C.P.L. § 330.20(2) and (3) to obtain judicial approval prior to discharging or releasing plaintiff although judicial permission is not required for the discharge or release of civilly committed persons within the New York Department of Mental Hygiene, (3) the standard for release set forth in C.P.L. § 330.20(3)—i. e., "without danger to himself or others"—is unconstitutionally vague, (4) the failure of C.P.L. § 330.20(3) to refer to the mental disease or defect which gave rise to the presumption of dangerousness upon which plaintiff's initial commitment was premised renders the standard for release inconsistent with the underlying basis for his commitment, (5) plaintiff has the burden of proof to show that he is not dangerous in order to secure his release, and (6) plaintiff having been committed pursuant to C.P.L. § 330.20 is deprived of the same opportunity for rehabilitation, medical care and treatment as is afforded his civilly committed counterparts. Plaintiff further alleges that

his confinement without adequate care and treatment constitutes cruel and unusual punishment proscribed by the Eighth Amendment.

 The involuntary commitment of an individual who has been acquitted because of a reasonable doubt as to his sanity at the time of the commission of the crime for which he was tried involves a substantial deprivation of liberty. *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *Minnesota v. Probate Court,* 309 U.S. 270, 276, 60 S.Ct. 523, 84 L.Ed. 744 (1940). There can be no doubt, however, that a state (as well as the federal government) pursuant to its police power can involuntarily commit and confine the dangerously mentally ill provided their constitutional rights have been adequately safeguarded. *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Greenwood v. United States,* 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956). Nevertheless, it remains settled law that a state cannot constitutionally "confine without more" a non-dangerous mentally infirm individual who is capable of living safely in freedom on his own or with the assistance of responsible family members or friends. *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). The United States Supreme Court has recognized that the statutory procedures by which an individual is committed following his acquittal by reason of mental disease or defect are subject to the Equal Protection Clause, *Baxstrom v. Herold,* 383 U.S. 107, 110, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), and to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, *Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

In *Jackson v. Indiana, supra,* petitioner who was found incompetent to stand trial challenged on equal protection and due process grounds the constitutionality of his indefinite pretrial commitment until he "shall become sane". The court held that the State of Indiana deprived petitioner of the equal protection of the laws by applying to him a more lenient commitment standard coupled with a more stringent standard for release than were generally applicable to all others involuntarily committed. In addition, the court found that petitioner's rights to due process were violated by his indefinite commitment. It was held that a person charged with a crime who is committed on account of his incapacity to proceed to trial cannot be confined for more than a reasonable period of time necessary to determine whether there is substantial probability that he will attain competency in the foreseeable future and, if it is determined that he will not, then customary civil commitment proceedings must be instituted to detain him further or he must be released.

In *Baxstrom v. Herold, supra,* the court held that a state prisoner civilly committed at the expiration of his prison sentence was denied equal protection when he was deprived of a jury trial that the State of New York made available to all other persons civilly committed. It was further held that petitioner was denied equal protection by his civil commitment to a mental institution under the jurisdiction of the New York Department of Correction beyond the expiration of his prison term without a judicial determination that he was dangerously mentally ill as was afforded to all others civilly committed. In so holding, the court rejected the State's contention that it was reasonable to classify persons who have been convicted of a crime and later found to be mentally ill with those found to be dangerously insane because the former are both mentally ill and have criminal tendencies as evidenced by their past criminal records. Finding such argument untenable, the court stated that, where a judicial proceeding is provided to determine the dangerousness of all others civilly committed, such may not be denied to a prisoner found to be insane at or nearing the end of his prison sentence. Thus, past criminal conduct alone cannot be justification for substantial differences in the procedures and requirements for commitment following acquittal by reason of insanity as opposed to general civil commitments.

In *Specht v. Patterson, supra,* the petitioner was convicted of a sex offense under a Colorado statute that carried a maximum sentence of ten years, but was sentenced under that state's Sex Offender Act to an indeterminate term of from one day to life without notice and a hearing. After petitioner had been examined and a psychiatric report prepared and submitted to the court prior to sentencing, the trial judge determined without a hearing that petitioner constituted "a threat of bodily harm to members of the public, or [was] an habitual offender and mentally ill", and accordingly invoked the sentencing provisions of the state's Sex Offender Act. The Supreme Court found such procedure deficient under principles of due process and held that a convicted sex offender was entitled to a full hearing on the question of his mental illness, habitual tendencies, and dangerousness to society before he could be sentenced to an indefinite term as dangerously mentally ill.

In *Bolton v. Harris,* 130 U.S.App.D.C. 1, 395 F.2d 642 (1968), appellant who had been acquitted upon his own plea of not guilty by reason of insanity was committed pursuant to the District of Columbia's mandatory commitment statute. His appeal challenged on equal protection grounds both the mandatory commitment and release provisions of the District of Columbia Code alleging that they did not provide to an individual who is committed after being acquitted by reason of insanity the safeguards afforded to those civilly committed under the Hospitalization of the Mentally Ill Act of 1964. The District of Columbia Code provided for the automatic commitment without any hearing of a person who was tried for an offense and acquitted solely on the ground that he was insane at the time of its commission, even though as under the law of New York acquittal by reason of insanity in the District of Columbia reflects only a reasonable doubt that a defendant was sane at the time of the offense. As with a commitment under C.P.L. § 330.20(1), the period of confinement under the District of Columbia Code was indeterminate and unrelated to the length of sentence which could have been imposed upon conviction. A patient confined thereunder may be released, as under C.P.L. § 330.-20(3), only upon a court order which must be based upon either the certificate of the superintendent of the mental hospital where the patient was confined or the patient's petition for a writ of habeas corpus. In the latter case release was conditioned upon the patient's proving beyond a reasonable doubt that he was free "from such abnormal mental condition as would make the individual dangerous to himself or others in the foreseeable future". The court noted that such statutory scheme could conceivably allow a patient committed following acquittal by reason of insanity to remain confined in a mental hospital indefinitely without a judicial determination that he was mentally ill at the time of his commitment or that he had dangerous propensities. In contrast to these provisions, the Hospitalization of the Mentally Ill Act required a pre-commitment judicial determination and placed the burden of proving insanity on the government. Relying upon *Baxstrom v. Herold* and *Specht v. Patterson,* the court found the District of Columbia Code to be constitutionally suspect in that it provided for procedures substantially different for persons committed after being acquitted by reason of insanity than those for civilly committed patients and because no provision was made for a hearing to determine the mental condition and dangerousness of the acquittee at the time of commitment. First considering whether immediate commitment without a hearing following acquittal by reason of insanity was constitutionally permissible and relying upon *Ragsdale v. Overholser,* 108 U.S.App. D.C. 308, 281 F.2d 943 (1960), the court found that commitment without a hearing for a reasonable period of time sufficient to determine present mental condition and to allow trained medical experts a reasonable opportunity to observe and examine so as to determine whether the individual committed would be dangerous if released does not offend principles of due process. The court reasoned that defendant's acquittal by rea-

son of insanity and such verdict's implicit finding only that there was reasonable doubt as to defendant's sanity at the time of the offense provides sufficient basis for temporary commitment without a hearing for further examination in order to protect society from imminent recurrence of a criminal act by the acquittee. The court, however, left open the question of what length of time would be reasonable for such a determination of dangerousness. It was concluded that, once the examination period was over, a person found not guilty by reason of insanity must be given a judicial hearing with procedures substantially similar to those in civil commitment proceedings to determine whether he was dangerously mentally ill at the time of commitment. The decision in *Bolton* was cited with approval as a valid extension of the principles established in *Baxstrom* by the United States Supreme Court in *Jackson v. Indiana, supra,* 406 U.S., at 724, 92 S.Ct. 1845.

In a recent class action, *Dorsey v. Solomon,* 435 F.Supp. 725 (D.Md.1977), plaintiffs sought a declaratory judgment that certain Maryland statutory provisions which provided for the involuntary commitment without a judicial hearing of persons found not guilty by reason of insanity violated their right to due process and equal protection. The Maryland Code provided that a defendant acquitted by reason of insanity was, in the discretion of the court, to be committed to the Department of Mental Hygiene for examination and evaluation to determine whether such person would, if released, be a danger to himself or to the safety of others. Following such examination and evaluation, the facility where plaintiff was confined was to file a report with the court which was then to make a determination based upon such report and other evidence before it whether such person should be confined for treatment because of his dangerous propensities. The statute granted the committed person the right to apply for his release at any time after three months from the first day of his confinement. It is of interest to note that, following extensive discovery proceedings,

the court approved a partial consent decree which provided, *inter alia,* that the State of Maryland would give an insanity acquittee committed for evaluation a prompt judicial hearing before confinement for treatment and set strict time limitations within which such a hearing must be held. The decree specified that the Department of Health and Mental Hygiene shall submit to the court the required evaluation report not later than thirty days from the date of the court's order directing evaluation and examination of the insanity acquittee and that such individual shall not be confined for treatment without a judicial hearing for longer than sixty days after receipt by the court of the evaluation report.

We are aware that the majority of courts which have been confronted with due process and equal protection challenges to statutes providing for the mandatory or discretionary commitment to mental institutions without a hearing of a person found not guilty by reason of insanity at the time of the commission of the crime has upheld such provisions. *See, Lindner v. Peterson,* 324 F.Supp. 1261 (W.D.Mo.1971); *State v. Kent,* 515 S.W.2d 457 (Mo.Sup.Ct.1974); *State v. Kee,* 510 S.W.2d 477 (Mo.Sup.Ct. 1974); *Chase v. Kearns,* 278 A.2d 132 (Me. Sup.Jud.Ct.1971); *State ex rel. Schopf v. Schubert,* 45 Wis.2d 644, 173 N.W.2d 673 (Wis.Sup.Ct.1970); *Mills v. State,* 256 A.2d 752 (Del.Sup.Ct.1969); *State v. Allan,* 166 N.W.2d 752 (Iowa Sup.Ct.1969); *State v. Marzbanian,* 198 A.2d 721 (Conn.Cir.Ct. 1963); *People v. Dubina,* 304 Mich. 363, 8 N.W.2d 99, *cert. denied,* 319 U.S. 766, 63 S.Ct. 1331, 87 L.Ed. 1716, *rehearing denied,* 320 U.S. 811, 64 S.Ct. 31, 88 L.Ed. 490 (1943); *Hodison v. Rogers,* 137 Kan. 950, 22 P.2d 491 (1933); *Ex Parte Slayback,* 209 Cal. 480, 288 P. 769 (1930); *State v. Saffron,* 146 Wash. 202, 262 P. 970 (1927); *Ex Parte Ostatter,* 103 Kan. 487, 175 P. 377 (1918); *Ex Parte Clark,* 86 Kan. 539, 121 P. 492 (1912); *People ex rel. Thaw v. Lamb,* 118 N.Y.S. 389 (1909); *People ex rel. Peabody v. Baker,* 59 Misc. 359, 110 N.Y.S. 848 (1908); *State ex rel. Thompson v. Snell,* 46 Wash. 327, 89 P. 931 (1907). In general,

these cases have held that the statutory provisions providing for the involuntary commitment of such an individual without a hearing to inquire into his or her mental condition at the time of commitment does not involve a deprivation of liberty without due process because it is reasonable for the law to establish a presumption that such individual's mental infirmity at the time of the offense continues to the time of trial or is likely to recur, the individual's interest in liberty is outweighed by society's right to peace and safety and to be protected from the imminent recurrence of criminal activity, the commitment statutes provide adequate methods by which the committed person can challenge confinement and obtain release, and the committed individual had been given sufficient opportunity to establish his or her present sanity during the course of trial. In addition, these courts have generally rejected equal protection challenges on the grounds that the equal protection clause does not mandate that all persons be treated in an identical fashion and that the difference in treatment afforded to those acquitted by reason of insanity from that accorded those otherwise civilly committed was justified by the insanity acquittee's past criminal conduct and prior injury to society. Despite the above, recent cases have held that the automatic commitment of an individual upon a verdict of not guilty by reason of insanity without a hearing to determine his mental condition and dangerousness at the time of commitment was violative of due process and equal protection. *See, State v. Krol,* 68 N.J. 236, 344 A.2d 289 (N.J.Sup.Ct.1975); *People v. McQuillan,* 392 Mich. 511, 221 N.W.2d 569 (Sup.Ct.1974); *State ex rel. Kovach v. Schubert,* 64 Wis.2d 612, 219 N.W.2d 341 (Sup.Ct. 1974), *appeal dismissed,* 419 U.S. 1117, 95 S.Ct. 799, 42 L.Ed.2d 817 (1975), *cert. denied,* 419 U.S. 1130, 95 S.Ct. 816, 42 L.Ed.2d 829 (1975); *Wilson v. State,* 259 Ind. 375, 287 N.E.2d 875 (Ind.Sup.Ct.1972). In *State v. Krol, supra,* the New Jersey Supreme Court held that the state's involuntary commitment procedures following an acquittal by reason of insanity were unconstitutional in that they provided for commitment with-

out a hearing to be held within a reasonable time thereafter at which the state must show by a preponderance of the evidence that the committed individual was mentally ill and dangerous to himself or others. The court opined that an immediate sixty-day commitment period following acquittal during which the individual could be examined, observed and evaluated prior to the hearing was reasonable. In *People v. McQuillan, supra,* the court read into the Michigan commitment statute the requirement that a hearing be conducted within sixty days of the commitment of an individual acquitted by reason of insanity to determine his present mental condition. The court found that societal interests in being protected from the dangerously mentally ill, the past criminal conduct of the insanity acquittee and the need for a reasonable period of time to examine such a person so that a meaningful determination as to dangerousness could be made justified immediate temporary detention for a reasonable period of time. But, the court found that constitutional principles of due process and equal protection announced in *Baxstrom v. Herold, supra, Specht v. Patterson, supra,* and *Bolton v. Harris, supra,* mandated a judicial hearing after completion of the examination and observation period.

Returning to the instant case, the mandatory and immediate commitment of plaintiff following his acquittal of murder by reason of insanity pursuant to C.P.L. § 330.20(1) without a pre-commitment hearing to determine his then present mental condition and dangerousness does not violate his rights to due process. Implicit in a verdict of acquittal by reason of mental disease or defect is a finding that the defendant did commit the criminal acts for which he was tried, although of course there was no *mens rea* and thus no criminal culpability. *Ragsdale v. Overholser, supra,* 108 U.S.App.D.C. at 313, 281 F.2d at 948. The protection and safety of the public outweighs an insanity acquittee's immediate liberty interests. Furthermore, the defendant himself raised the defense of insanity and the prosecution failed to disprove

such defense beyond a reasonable doubt. Therefore, detention for a reasonable period of time for observation and examination is necessary to determine whether he remains mentally infirm and dangerous to himself or to others. Plaintiff's immediate commitment following acquittal prior to a judicial hearing also does not violate equal protection. Various provisions of New York's Mental Hygiene Law provide in appropriate circumstances for involuntary civil commitment for temporary periods without a prior hearing.

■ However, C.P.L. § 330.20(1), on its face, suffers from a critical flaw of constitutional dimension because it mandates commitment of a defendant acquitted by reason of mental disease or defect without requiring a post-commitment hearing to inquire into and determine such individual's mental condition and dangerousness at the time of commitment. The trial verdict's finding of a reasonable doubt of sanity at the time of the commission of the offense, although supportive of immediate temporary detention, does not justify indefinite commitment without a hearing. *Specht v. Patterson, supra.* Section 330.20(1) of the Criminal Procedure Law, as written, does not require a hearing to be held within a reasonable period of time to inquire into the mental condition of the individual at the time of commitment. Due process requires that a defendant committed pursuant to C.P.L. § 330.20(1) be given a judicial hearing to determine his mental condition and dangerousness within a reasonable time after commitment. Such would strike a proper balance between the rights of the public to be protected from the recurrence of criminal activity and the liberty interest of the insanity acquittee. The fact that C.P.L. § 330.20(5) gives the committed person the right to apply for his discharge or release to the court does not remedy the constitutional defect. Such application will only trigger the hearing mechanisms of C.P.L. § 330.20(2) and (3) after the Commissioner files a report with the court and the court considers that the application may be meritorious. Moreover, at the commitment stage, the state should bear the burden of safeguarding a committed person's due process rights and should not shift the burden to the insanity acquittee who may be unaware of his rights or not mentally competent to vindicate them. C.P.L. § 330.-20(5) does not provide an adequate release mechanism to save the constitutionality of C.P.L. § 330.20(1) on its face. To so hold would jeopardize the due process rights of the unwary and unsophisticated.

■ The failure of C.P.L. § 330.20(1), as written, to afford the insanity acquittee a hearing within a reasonable time after his commitment deprives him of the equal protection of the laws. *Baxstrom v. Herold, supra.* With respect to involuntary civil commitments, New York's Mental Hygiene Law provides that detention is only permissible for a specified period of time after which the person committed must be afforded a judicial hearing to justify his commitment. Section 31.31(a) of New York's Mental Hygiene Law gives a patient who has been involuntarily civilly committed on medical certification the right to demand a hearing within sixty days of his commitment to determine whether he is in need of retention. Section 31.33(a) mandates that the Commissioner, if he determines that the individual civilly committed should be retained, must apply to the appropriate state court for an order authorizing continued retention within sixty days from the date of involuntary admission on medical certification, if the patient has not requested a hearing pursuant to section 31.31, or within thirty days from the order denying plaintiff's release after a section 31.31 hearing, whichever is later. Section 31.39 authorizes emergency admissions for immediate observation, care and treatment without a hearing, but only for a period not to exceed fifteen days. After forty-eight hours, such an individual committed on an emergency basis may not be detained unless two staff physicians find upon examination that release of such person would likely result in serious harm to himself or others. Thereafter, the patient has a right to a hearing on the question of need for immediate observation, care and treatment. If the court

finds that there is reasonable cause to believe that the patient has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others, the court may order his retention for a period not to exceed fifteen days from the date of admission. Beyond this initial fifteen day period, a patient may not be detained unless there is compliance with the provisions governing involuntary admissions on application supported by medical certification and the attendant notice and hearing requirements set forth in sections 31.31 and 31.33. Given the hearing provisions of these involuntary civil commitment statutes, the failure of C.P.L. § 330.20(1) on its face to provide for a hearing within a reasonable period of time after commitment does not accord equal protection. The substantial disparity of treatment on the face of the statutes with respect to the right to a post-commitment hearing between insanity acquittees and others involuntarily committed is not rationally related to such classification. *Baxstrom v. Herold, supra; United States ex rel. Schuster v. Herold*, 410 F.2d 1071 (2d Cir. 1971).

The New York courts, however, have interpreted C.P.L. § 330.20(1) in a constitutional fashion by incorporating into the Criminal Procedure Law the procedural due process safeguards applicable in involuntary civil commitments set forth in New York's Mental Hygiene Law. In *People v. Lally, supra*, the New York Court of Appeals therein faced with a constitutional challenge to the mandatory commitment provision of section 454(1) of the Code of Criminal Procedure, the predecessor to C.P.L. § 330.20(1), construed the commitment period mandated by said section to be of temporary duration for the purpose of "detention, examination and report as to * * * sanity." *Id.*, 277 N.Y.S.2d at 659, 224 N.E.2d at 91. Furthermore, the court stated that:

"To comply with the spirit if not the express language of the *Baxstrom* decision (supra) we hold that, before there can be any commitment to [a hospital] for the insane under section 454 procedures, a

person must be accorded all the protections of sections 74 and 85 of the Mental Hygiene Law including a jury trial, if requested." *Id.*, at 660, 224 N.E.2d at 92.

Thus, the court held that the due process safeguards of the Mental Hygiene Law, including the right to a post-commitment hearing, must be read into the Criminal Procedure Law provisions mandating immediate commitment of an insanity acquittee. The United States Court of Appeals for the Second Circuit in *United States ex rel. Schuster v. Herold, supra*, at 1082, interpreted *Lally* as embracing the broad purpose as well as the specific holding of *Baxstrom* and stated that the New York Court of Appeals

"made it clear that one who has been adjudicated not guilty by reason of insanity is entitled to the same procedures used to determine committability of an individual who is not otherwise before a court."

In a subsequent New York state decision, *People v. McNelly, supra*, the court, recognizing that section 330.20(1) of the Criminal Procedure Law could not be enforced as written, proceeded "to refashion the statute under the guise of interpretation to preserve its constitutionality." *Id.*, at 542. Relying upon *People v. Lally, supra*, the trial judge interpreted the statute as mandating detention for only so long as shall be reasonably necessary for the Commissioner to examine the insanity acquittee and to report his findings to the court. *People v. McNelly, supra*, at 543. Furthermore, the court stated that the teachings of *Jackson, Baxstrom, Schuster* and *Lally* required that all the procedural safeguards available to individuals involuntarily civilly committed under the Mental Hygiene Law be accorded to those who have been acquitted of a crime by reason of mental disease or defect. Under this holding, the court instructed the Commissioner, if he were of the opinion that commitment should continue beyond the detention and examination period, to petition for the retention of the insanity acquittee in accordance with the procedures for court authorization to retain an involun-

tary patient set forth in section 31.33 of the Mental Hygiene Law. *See, also, Lashway v. Hanes,* 78 Misc.2d 979, 357 N.Y.S.2d 747 (St.L.Co.Ct.1974).

■■■ A federal court reviewing the constitutionality of a state statute must accept the construction given such enactment by the state courts. *Law Students Research Council v. Wadmond,* 401 U.S. 154, 162, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971); *Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); *Kingsley Pictures Corp. v. Regents,* 360 U.S. 684, 688, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959); *Speiser v. Randall,* 357 U.S. 513, 519, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); *Poulos v. New Hampshire,* 345 U.S. 395, 402–08, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); *Albertson v. Millard,* 345 U.S. 242, 244, 73 S.Ct. 600, 97 L.Ed. 983 (1953); *United States v. Burnison,* 339 U.S. 87, 89, 70 S.Ct. 503, 94 L.Ed. 675 (1950); *Terminiello v. Chicago,* 337 U.S. 1, 5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Aero Transit Co. v. Comm'rs,* 332 U.S. 495, 499–500, 68 S.Ct. 167, 92 L.Ed. 99 (1947); *Fox v. Washington,* 236 U.S. 273, 277, 35 S.Ct. 383, 59 L.Ed. 573 (1915). In passing upon its constitutional validity, the state statute should be viewed as though the interpretative language of the state courts had been written into the act by the state legislature. *Poulos v. New Hampshire, supra* 345 U.S. at 402, 73 S.Ct. 760; *Terminiello v. Chicago, supra,* 337 U.S. at 4, 69 S.Ct. 894; *Winters v. New York,* 333 U.S. 507, 514, 68 S.Ct. 665, 92 L.Ed. 840 (1948); *Herbert v. Louisiana,* 272 U.S. 312, 317, 47 S.Ct. 103, 71 L.Ed. 270 (1926). Accepting as we must the judicial gloss placed upon C.P.L. § 330.20(1) by the New York Court of Appeals and the state's lower courts, the constitutional defect apparent on the face of the statute has been cured. The commitment mandated by C.P.L. § 330.20(1) is not one of indefinite duration, but is a temporary detention for only so long as is reasonably necessary to allow the Commissioner to examine the insanity acquittee and report his findings to the committing court. If continued confinement is deemed necessary by the Commissioner, the notice and hearing provisions applicable to individuals who

have been involuntarily civilly committed, set forth in section 31.33 of the Mental Hygiene Law, must be invoked to safeguard the insanity acquittee's liberty interest. This procedure comports with due process, *Fhagen v. Miller,* 29 N.Y.2d 348, 328 N.Y.S.2d 393, 278 N.E.2d 615, *cert. denied,* 409 U.S. 845, 93 S.Ct. 47, 34 L.Ed.2d 85 (1972); *In Re Coates,* 9 N.Y.2d 242, 213 N.Y.S.2d 74, 173 N.E.2d 797, *appeal dismissed,* 368 U.S. 34, 82 S.Ct. 147, 7 L.Ed.2d 91 (1961), and with equal protection, *Baxstrom v. Herold, supra.* Under such construction, we uphold the constitutionality of the mandatory commitment provision of C.P.L. § 330.20(1). We respectfully suggest, however, to the New York legislature that it would be appropriate to amend the statute to reflect the constitutionally mandated interpretations rendered by the New York courts.

■■ In the instant case, it is evident that C.P.L. § 330.20(1) was not applied to petitioner in accordance with the broad requirements laid down by *Lally* and that he was not afforded a judicial post-commitment hearing within a reasonable time after his mandatory commitment to determine his mental condition and dangerousness at such time. We hereby order the Commissioner to file in the appropriate state court within thirty days from the entry of this order a petition for plaintiff's continued confinement pursuant to section 31.33 of the Mental Hygiene Law. Plaintiff will thereby be afforded an opportunity for his post-commitment hearing. Absent such filing, plaintiff may move before the convening judge for appropriate relief.

■■■ The requirement in C.P.L. § 330.20(2) and (3) that an insanity acquittee cannot be released or discharged without judicial approval does not deny equal protection. The Equal Protection Clause does not mandate identity of treatment for all persons, but only requires that differences in treatment between two groups have relevance to the purpose for which the classification is made. *Baxstrom v. Herold, supra,* 383 U.S. at 111, 86 S.Ct. 760; *Wal-*

ters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 98 L.Ed. 660 (1954); *Reynolds v. Neill*, 381 F.Supp. 1374, 1381 (N.D.Tex. 1974), *vacated and remanded for reconsideration in light of O'Connor v. Donaldson, supra,* 422 U.S. 1050, 95 S.Ct. 2671, 45 L.Ed.2d 703 (1975), *aff'd on reconsideration* sub nom. *Reynolds v. Sheldon,* 404 F.Supp. 1004 (N.D.Tex.1975). The cases which have passed on the question of judicial approval prior to release of committed insanity acquittees have upheld such statutory provisions in face of equal protection challenges. *See, United States v. Ecker,* 156 U.S.App. D.C. 223, 226, 479 F.2d 1206, 1209 (1973); *Bolton v. Harris, supra,* 130 U.S.App.D.C. at 11, 395 F.2d at 652. The responsibility and burden of determining whether to release an insanity acquittee, who implicitly has been found to have committed the criminal acts for which he was tried, need not be abdicated by the judiciary and left entirely to the psychiatric community. We find judicial approval to have a rational basis in that such requirement will both provide to the public additional assurance against premature releases of the dangerously mentally ill and safeguard the due process rights of the insanity acquittee by fostering an evenhanded application of the standards for discharge or release on condition.

 The phrase "without danger to himself or others" set forth in C.P.L. § 330.20(3) is a constitutionally permissible standard for the discharge or release of an individual committed after his acquittal by reason of insanity. *See, Greenwood v. United States, supra,* 350 U.S. at 373–74, 76 S.Ct. 410; *United States v. Ecker, supra,* 156 U.S.App.D.C. at 226, 479 F.2d at 1209; *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 374, 373 F.2d 451, 459 (1966), *Hough v. United States,* 106 U.S.App.D.C. 192, 195, 271 F.2d 458, 461 (1959). Although the phrase is in and of itself vague and subject to inherent defects in application (*Millard v. Harris,* 132 U.S.App.D.C. 146, 406 F.2d 964 (1968); *Cross v. Harris,* 135 U.S.App.D.C. 259, 263, 418 F.2d 1095, 1099 (1969); *Application of Lublin,* 85 Misc.2d 48, 378 N.Y. S.2d 590, 595 (Suff.Coun.Ct.1976); *U. S. v. Charnizon,* 232 A.2d 586 (D.C.Ct.App.1967)),

in construing a statute one should not be confined to the bare words of the enactment. *Lynch v. Overholser,* 369 U.S. 705, 711, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962). Where possible a court should construe a statute, if such construction would be reasonable and consistent with its legislative purpose, in a manner which avoids constitutional infirmity. *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *Schneider v. Smith,* 390 U.S. 17, 27, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). Various courts have construed the term "danger to himself or others" to mean a propensity to commit criminal acts (*Reynolds v. Sheldon, supra,* at 1009), a reasonable foreseeability of danger to a patient or the community (*Rosenfield v. Overholser,* 104 U.S.App.D.C. 322, 262 F.2d 34 (1958)), a high probability of substantial injury (*Cross v. Harris, supra,* 135 U.S.App.D.C. at 263, 418 F.2d at 1099), and a likelihood of serious harm (*People v. McNelly, supra,* at 544). Although New York's Criminal Procedure Law does not define "without danger to himself or others", section 31.37 of the Mental Hygiene Law sets a standard of "likely to result in serious harm to himself or others" for involuntary civil commitments and defines such term to mean "substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself" or "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear or serious physical harm". At oral argument, plaintiff expressed the view that the civil involuntary commitment standard, if applied to an insanity acquittee, would be a constitutionally permissible standard. We agree and hereby construe the term "danger to himself or others" to mean likely to result in serious physical harm to himself or others as set

forth in section 31.37 of the New York Mental Hygiene Law. Under this construction, we hold the standard for release set forth in C.P.L. § 330.20(2) and (3) to be constitutionally valid. We respectfully suggest to the New York legislature that it would be appropriate to so define the release standard of the Criminal Procedure Law.

Plaintiff's argument that C.P.L. § 330.20(3) must reference the mental disease or defect which rendered him insane at the time of the commission of the offense is without merit. Plaintiff's present dangerousness may or may not stem from the original mental infirmity and his retention as an insanity acquittee may constitutionally be premised on dangerousness arising from past or newly-formed psychological maladies. Even if plaintiff's mental disease or defect at the time of the criminal act has been remedied, dangerousness arising from different psychological disorders that had not manifested themselves prior to his commitment would justify plaintiff's continued confinement for the protection of the public.

Plaintiff's contention that placing the burden of proof on him to show that he is not dangerous at a release hearing initiated pursuant to C.P.L. § 330.20(5) is unconstitutional has been rendered moot by two recent New York Appellate Division decisions. In *Lublin v. Central Islip Psychiatric Ctr.*, 56 A.D.2d 1, 391 N.Y.S.2d 603 (2d Dept.1977), and *People ex rel. Henig v. Com'r of Mental Hygiene*, 56 A.D.2d 398, 392 N.Y.S.2d 636 (1st Dept.1977), it was held that although an insanity acquittee has the burden of going forward with facts to raise an issue with respect to his lack of dangerousness, the State of New York has the ultimate burden of proving by a preponderance of the evidence that he is and will be dangerous to himself or others. Although the New York Court of Appeals has

not spoken on this issue, we believe that it would concur with these holdings. We therefore find it unnecessary to reach the merits of this issue.[1]

Plaintiff alleges that his rights to equal protection are violated because he is denied the opportunity to participate in rehabilitation programs away from the mental institution where he is confined. He attributes this denial to the fact that he must prove to a court that he is not dangerous in order to secure his release on condition. Plaintiff does not contend that he would be ineligible to participate in such programs if he were not dangerous. Plaintiff's equal protection argument is unpersuasive. His inability to participate in such off-grounds rehabilitation programs does not result from the judicial approval procedures or the standard for release, but stems from the fact that plaintiff would be a danger to the community if released to participate in such programs. The denial to the dangerously mentally ill of the opportunity to participate in rehabilitation programs in the outside community does not constitute a violation of equal protection.

Section 15.03(a) of New York's Mental Hygiene Law provides:

"Each patient in a facility and each person receiving services for mental disability shall receive care and treatment that is suited to his needs and skillfully, safely, and humanely administered with full respect for his dignity and personal integrity."

Defendants have represented to this Court that these provisions for care and treatment apply to an insanity acquittee, such as plaintiff, who has been committed to the Commissioner pursuant to C.P.L. § 330.20(1) and have conceded that if plaintiff's allegations of lack of treatment are proven such

---

1. The allocation of the burden of proof is outcome determinative in many situations. *Waite v. Jacobs*, 154 U.S.App.D.C. 281, 475 F.2d 392 (1973). Despite the evidentiary difficulty to an insanity acquittee, it has been held that the burden of proof may constitutionally be placed on the person seeking to be released. *Ragsdale v. Overholser, supra*; *Overholser v. Leach*, 103 U.S.App.D.C. 289, 257 F.2d 667 (1958), *cert. denied*, 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038 (1959); *Dorsey v. Solomon, supra*, at 740. As stated, we intimate no opinion on this issue.

statutory provision would be violated.[2] Although the plaintiff has alleged in his complaint that he is not receiving adequate care and treatment and that he is neither enrolled in any constructive program nor receiving any medical care and treatment specially designed to rehabilitate him, no proof as yet has been presented to the Court on these allegations. Such claims involve factual issues requiring a hearing at which proof must be adduced before a determination on them can be made. As this matter does not involve a challenge to the constitutionality of C.P.L. § 330.20, it may be disposed of by the convening judge and the instant action is hereby remanded to him for a hearing and final resolution on this issue and on the outstanding issues relating to plaintiff's entitlement to damages.

So ordered.

**2.** In this posture, we find it unnecessary to reach the constitutional issue whether the Eighth Amendment is also violated by such alleged lack of treatment. We merely note that the United States Supreme Court has not yet decided whether a dangerously mentally ill person confined for society's protection has a constitutional right to care and treatment. *See, O'Connor v. Donaldson, supra.*